IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JEFFERY K. LANE )
) Case No: 2:07-CV-200
v. ) GREER/CARTER
)
MICHAEL J. ASTRUE, )
    Commissioner of Social Security )

REPORT AND RECOMMENDATION

    This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the

final decision of the Commissioner of Social Security denying the plaintiff a period of disability

and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i)

and 423.

    This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of plaintiff's Motion for Judgment on the Pleadings (Doc. 11) and defendant's Motion

for Summary Judgment (Doc. 13).

    For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

Plaintiff's Age, Education, and Past Work Experience

    Defendant was 39 years old at the date of the ALJ's decision with a high school education

(Tr. 1577).  He had past work experience as a carpenter and stock person (Tr. 1577-78).  The

ALJ found that defendant could not return to this work (Tr. 29).

1

## Administrative Proceedings

Defendant filed his DIB application in August 2005, alleging disability from October 9, 2003 (Tr. 43-46). After his application was denied initially and on reconsideration, he requested a hearing (Tr. 37-42). On February 6, 2007, defendant appeared with his attorney to testify before ALJ John McFadyen (Tr. 1574-1605). Two medical experts testified: Thomas Schacht, M.D., (psychological) and Edward Griffin, M.D. (physical) (Tr. 1583-1600). Donna Bardsley testified as a vocational expert (Tr. 1601-02). On March 12, 2007, the ALJ found defendant was not disabled because he retained the RFC to perform work that exists in significant numbers in the national economy (Tr. 17-29). The Appeals Council's July 13, 2007, denial of review left the ALJ's decision as the final decision of the Commissioner (Tr. 7-10)

## Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has

done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once the Plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.,* 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and*

*Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Act on October 9, 2003, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since October 9, 2003.

3.  The medical evidence establishes that the claimant has "severe," in combination, obesity, back impairment, diabetes mellitus, and anxiety/phobia, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's testimony of impairments, limitations, and pain, of such severity to preclude him from engaging in substantial gainful activity is not credible, and is not supported by the totality of the evidence.

5.  The claimant retains the residual functional capacity as enumerated in the hypothetical question to the vocational expert.

6.  The claimant is unable to perform his past relevant work as a carpenter and stock person.

7.  The claimant is 39 years old, which is defined as a younger individual.

8.  The claimant has a high school education.

9.  The claimant does not have any acquired work skills which are transferable to the skilled or semi skilled work functions of other work.

10. Based on the exertional capacity for sedentary work, and the claimant's age, education, and work experience, section 404.1569 and Rule 201.22, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11. Although the claimant's additional nonexertional limitations do not allow him to perform the full range of sedentary work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are:

information clerks, order clerks, cashiers, ticket sellers, hand packers, and assemblers.

12. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 28-29).

## Issue Raised

Plaintiff raises the following issue: Whether the Commissioner's decision is supported by substantial evidence.

## Relevant Facts

### Medical Evidence

In December of 1999, Dr. Richard L. Brandon saw Plaintiff who complained of some type of brief seizure. He reported no past history of seizure and no family history of seizure. He had stopped taking his Klonopin for 3 to 4 days prior to the event. Dr. Brandon observed Plaintiff was in general a healthy but overweight appearing gentleman with an apparent seizure likely from drug withdrawal (Tr. 898). In April 2002, Plaintiff presented with complaints of low back pain brought on when he slipped in a puddle (Tr. 897). In August of 2002, Plaintiff reported he fell at work and was unable to move his right side and was unable to speak. He was evaluated by the stroke team and neurology. His MRI was negative. He was diagnosed with a conversion disorder. He expressed concern about sleep apnea and loud snoring (Tr. 896). In September 2002, Plaintiff returned for a follow up and was generally doing pretty well. He did undergo sleep study which did not reveal definite obstructive sleep apnea. He was encouraged to reduce his weight (Tr. 895). In November 2002, Plaintiff returned for a follow up and reported feeling much better. Dr. Brandon referred to him as an obese but otherwise healthy appearing

adult male. He assessed Hypertension improving and vague abdominal discomfort (Tr. 895). In August 2003, Plaintiff saw Dr.Brandon with complaints of low back pain and left knee difficulty (Tr. 894). Plaintiff reported pain with walking or prolonged standing (Tr. 894). He weighed 350 pounds (Tr. 894). Dr. Brandon explained that they had a "long discussion" concerning Plaintiff's weight and discussed either gastric bypass surgery or medication (Tr. 894). They decided to try a course of medication (Tr. 894). Dr. Brandon assessed hypertension; obesity; low back pain with degenerative disc disease; and left knee pain, possible internal derangement (Tr. 894). In October 2003, Plaintiff was admitted to the hospital after a back injury at work while lifting pallets (Tr. 998). Stanley M. Hodges, M.D., assessed possible acute herniation and prescribed medication (Tr. 999-1153). He was scheduled for outpatient physical therapy and weight loss was encouraged (Tr. 994, 995). In November 2003, Plaintiff returned to Dr. Brandon and reported that he had been recently hospitalized with an acute herniated lumbar disc problem (Tr. 893). Plaintiff complained of swollen legs and evening dizziness when he stood (Tr. 893). He weighed 322 pounds (Tr. 893). Dr. Brandon assessed venous insufficiency and prescribed compressive stockings (Tr. 894). In November 2003, Plaintiff saw Samuel D. Breeding, M.D., and reported his October 2003 fall and back injury (Tr. 980). Plaintiff then saw William Platt, M.D., for epidural injections in November 2003 (Tr. 989-92). On November 21, 2003, two weeks after injection, Plaintiff reported no pain relief for the first three days but over the ensuing days he did do quite a bit better. Dr. Platt noted Plaintiff was obviously more comfortable, able to ambulate in and out of the clinic without too much difficulty. Dr. Platt recommended another epidural (Tr. 989). On January 16, 2004, Plaintiff returned to Dr. Platt for a reevaluation. A

second epidural was not done.  Plaintiff reported his doctors were contemplating a return to work. Dr. Platt noted Plaintiff was moving about with alacrity (Tr.  987, 988).

On November 29, 2003, Plaintiff was admitted to the hospital for several days for treatment of viral meningitis (Tr. 1154-1217).  At discharge, on December 4, 2003, Shubba R. Chatra, M.D., explained to Plaintiff that he needed to take his medications and "strongly advised" Plaintiff to lose weight (Tr. 1155).  On December 11, 2003, Dr. Breeding reported that Plaintiff moved in a "very guarded fashion" (Tr. 978).  In January 2004, Plaintiff returned to Dr. Breeding and complained of left hip pain radiating to his lumbar spine (Tr. 971).  He reported that both his feet were numb (Tr. 971).  On examination, Plaintiff moved in a guarded fashion (Tr. 971).  Straight leg raise increased back pain on the left (Tr. 971).  Plaintiff also reported numbness in his left big toe (Tr. 971).  Dr. Breeding diagnosed low back pain with left radicular symptoms (Tr. 971).  Dr. Breeding explained that Plaintiff's October 2003 hospitalization had been lengthened simply due to the scheduling of tests (Tr. 970).  Plaintiff had become "extremely angry" when the doctors had suggested that some of his testing could be done on an out-patient basis because he felt he was not able to go home (Tr. 970).

On January 2, 2004, Plaintiff returned to Dr. Brandon, who noted some decreased swelling in his legs.  Plaintiff was still having significant back and leg pain and was to start physical therapy.  Dr. Brandon noted chronic venous stasis changes in both lower extremities but markedly reduced edema (Tr. 893).  Dr. Brandon assessed hypertension; Type II diabetes; obesity; and venous insufficiency (Tr. 893).  On January 28, 2004, Dr. Platt reviewed Plaintiff's test results and explained that Plaintiff had a mass effect on the left lateral aspect of the thecal sac

L3-4 with a mild mass effect on his left L4 nerve root and a severe narrowing of left L3-4 due to disc protrusion and osteophyte (Tr. 986). In February 2004, although Plaintiff stated his progress in physical therapy was slow and Plaintiff did not believe he was even able to do light duty work, Dr. Breeding suggested that Plaintiff's condition had improved enough that they should consider him returning to light duty in the very near future (Tr. 964). On March 3, 2004, Plaintiff reported to Dr. Breeding that his physical therapy was going fairly well but he got weak when standing or walking "very long" (Tr. 961). On April 21, 2004, Dr. Breeding reported that a functional capacity evaluation demonstrated that Plaintiff could lift up to twenty-four pounds occasionally, twelve pounds frequently, and six pounds constantly (Tr. 960, referring to Tr. 1239-46).

On March 24, 2004, Plaintiff underwent a sleep study (Tr. 916-26). Robert Scott Macdonald, M.D., reported that the study was abnormal, consistent with sleep disordered breathing (Tr. 916). He suggested a repeat study and CPAP therapy to assess Plaintiff's clinical response to CPAP (Tr. 916). On April 1, 2004, Plaintiff explained to Dr. Brandon he had been hospitalized for chest pain but the work-up was negative (Tr. 892, referring to Tr. 1249-1330). On May 25, 2004, Plaintiff reported a syncopal episode at home. Dr. Brandon assessed a syncopal episode, questionable orthostatic hypotension, questionable seizure disorder (Tr. 891). On June 1, 2004, Dr. Brandon gave him some medication patches for seizures and recommended further work-up if the spells did not clear up quickly (Tr. 891). On July 30, 2004, Plaintiff reported to Dr. Brandon dizziness from medication, a negative cardiac evaluation for cardiac ischemia, a painful right leg and a lot of stress, primarily due to his separation from his wife (Tr. 890). Dr. Brandon felt Plaintiff's dizzy spells were probably related to stress (Tr. 891).

On July 7, 2004, Plaintiff reported to Dr. Breeding that he had stopped using his crutches and that he felt that he would be ready to return to work (Tr. 957). Dr. Breeding released Plaintiff to return to work on July 12, 2004, with a restriction from lifting over twenty pounds and to avoid repetitive bending, and that he may need to sit occasionally (Tr. 957). On July 30, 2004, Plaintiff returned to Dr. Breeding and reported that his symptoms had increased and he felt that he needed to be off work for a while longer (Tr. 955). In August 2004, Plaintiff reported to Dr. Breeding that his pain became much worse after the Medrol was finished and his leg continued to be weak at times (Tr. 952). Dr Breeding noted the nerve conduction study confirmed acute to subacute radiculopathy of the left S1 nerve which was consistent with his symptoms and MRI findings (Tr. 952). Plaintiff reported he was "afraid" to go back to work because he needed to lay down several times a day to be comfortable and he was concerned that his leg would give out on him and he would injure himself (Tr. 952). Plaintiff's employer informed Dr. Breeding that they would allow Plaintiff to return to work with restrictions, but Dr. Breeding was concerned about Plaintiff's need to lie down and his left leg weakness (Tr. 952).

In September 2004, Plaintiff saw Neal A. Jewell, M.D., at the request of Plaintiff's employer for an independent medical evaluation (Tr. 1333-39). Dr. Jewell reviewed Plaintiff's medical records, including the objective test results (Tr. 1336-38). The doctor examined Plaintiff and listened to his subjective complaints. He found Plaintiff to be alert, oriented, and in no acute distress. He found no spasm. Dr. Jewell noted during different portions of the examination, Plaintiff was kind of shaky or tremulous which was not consistent and appeared to be non-anatomic. Dr. Jewell noted a very slight variable left limp. It was marked throughout most of

the formal examination but was essentially gone when noted leaving the office. Plaintiff's gait pattern was much more normal leaving the office, much more normal pace, as opposed to the slow process when walking in the examining room (Tr. 1335). Dr. Jewell noted that Plaintiff had subjective complaints that were not well supported by the objective findings (Tr. 1338). He opined Plaintiff was "eligible" to return to work with restrictions to protect him from re-injury (Tr. 1339).

In March 2005, Plaintiff was admitted to the hospital for treatment of a seizure-like episode (Tr. 1350-69). The history given to Dr. Wright indicated he had seizures off and on since age 17, contrary to what he reported to Dr. Brandon in December of 1999 (Tr. 1362 and 898). Tests were mildly abnormal for EEG and normal for CAT scan (Tr. 1365-69, 1513). Douglas Wright, M.D., noted inconsistencies on examination (Tr. 1362-63). For example, Dr. Wright explained that when asked to lift his right leg, Plaintiff, "with apparent theatrical impressive effort," was unable to lift it (Tr. 1363). When asked to lift his left leg, he gave "good downward pressure" on his right leg, which suggested that he was able to move his right leg (Tr. 1363). Plaintiff returned to the hospital in April 2005, explaining that he was unable to walk (Tr. 1354, 1456-57). An MRI of the lumbar spine revealed no significant abnormalities (Tr. 1473). On April 4, 2005, Plaintiff was discharged with some continued right foot paresis and instructions for physical therapy, occupational therapy, and a walker (Tr. 1350). On May 17, 2005, Dr. Wright happened to be in the sleep lab when he saw Plaintiff, who walked "completely normal[ly]" in the hall (Tr. 1505). Plaintiff reported that his leg was "dramatically better" (Tr. 1505). Dr. Wright prescribed seizure medication as a precautionary measure (Tr. 1507).

Plaintiff reported better sleep with the CPAP and Dr. Wright felt that Plaintiff's excessive daytime sleepiness would improve with the use of the CPAP and noted dramatic improvement (Tr. 1507).

On July 25, 2005, Plaintiff returned to Dr. Brandon and reported that he "occasionally" had a little dizziness with standing quickly but had not had any further apparent seizures (Tr. 888). His lower extremity numbness and weakness was improving (Tr. 888). He continued to have difficulty with low back pain (Tr. 888). On August 23, 2005, Plaintiff returned to Dr. Wright and reported that he had no more seizures (Tr. 1501). His leg was still "doing well" although his right foot still felt somewhat numb when he walked. He still had some excessive daytime fatigue but was much better with CPAP (Tr. 1501). On August 29, 2005, Plaintiff went to the emergency room for treatment of shortness of breath and chest tightness (Tr. 865). Plaintiff reported a 1995 cardiac catherterization and a 2003 normal stress test (Tr. 865, 867-70). He saw Herbert D. Ladley, M.D., who noted that Plaintiff described episodes of near-fainting that were "quite vague." Plaintiff had multiple complaints, most of which were poorly described and atypical (Tr. 861). Plaintiff first stated that his blood sugar levels were "okay" during the episodes and then later reported that his blood sugar level dropped (Tr. 861). An EKG was normal (Tr. 856-59, 862). Dr. Ladley's impressions were atypical symptoms with mildly abnormal stress test; morbid obesity (Plaintiff weighed 321 and he was 6'2" tall); dyslipidemia; and diabetes (Tr. 862-63). Dr. Ladley advised aggressive risk factor management with significant weight loss (Tr. 863).

In August 2005, Plaintiff returned to Dr. Wright (Tr. 884-87). Dr. Wright noted that

Plaintiff was able to bear weight and could walk without difficulty and all strength tested in the upper extremities and left lower extremity were normal. Some minimal give away weakness was noted (Tr. 884). Dr. Wright recommended a CPAP mask (Tr. 886). In November 2005, Plaintiff saw Mark C. Baxter, D.P.M., with complaints of right foot swelling (Tr. 1376-77). Plaintiff explained that he had a foreign body in his foot that was taken out but he felt that there was still infection (Tr. 1376). Dr. Baxter agreed that Plaintiff had an abscess and he drained it (Tr. 1376-77). By the beginning of December 2005, Plaintiff's incision was closed with no edema or erythema (Tr. 1372).

On December 5, 2005, Plaintiff saw Steven Lawhon, Psy.D., at the request of the state agency (Tr. 1379-82). Dr. Lawhon explained that Plaintiff appeared to be moderately anxious and depressed (Tr. 1382). Plaintiff reported flashbacks of a tornado that occurred when he was nineteen years old (Tr. 1382). Dr. Lawhon diagnosed depression and post-traumatic stress disorder (Tr. 1381). Dr. Lawhon opined that Plaintiff's ability to understand and remember was not significantly limited; his ability to sustain concentration and persistence was moderately limited; his social interaction was not significantly limited; and his ability to adapt was moderately limited (Tr. 1382).

On December 15, 2005, Karen B. Lawrence, Ph.D., reviewed Plaintiff's records for the state agency (Tr. 1383-1400). In considering the "B" criteria of the mental listings, Dr. Lawrence opined that Plaintiff had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 1397). As for an RFC, Dr. Lawrence opined that Plaintiff

could perform simple repetitive tasks; maintain simple schedules and routines; relate adequately to others; maintain appropriate social behavior; and adapt to gradual, infrequent changes (Tr. 1385).

On December 19, 2005, Plaintiff saw Dr. Breeding (Tr. 1401-05). On examination, Plaintiff had a normal gait and station (Tr. 1404). He used no assistive device (Tr. 1404). He had normal range of motion of all major joints except for the lumbar spine, which was reduced (Tr. 1404). Dr. Breeding opined that Plaintiff could lift twenty-five pounds occasionally; sit for four-to-six hours in an eight-hour workday; stand for two-to-four hours in an eight-hour workday; and needed a sit/stand option for comfort (Tr. 1405).

On January 12, 2006, James P. Lester, M.D., reviewed Plaintiff's records for the state agency (Tr. 1439-46). Dr. Lester opined that Plaintiff remained capable of performing medium work (Tr. 1440). Plaintiff could never climb ladders, ropes, or scaffolds (Tr. 1441). He could occasionally (as opposed to frequently) balance and climb ramps and stairs (Tr. 1441). Plaintiff needed to avoid concentrated exposure to temperature extremes (Tr. 1443).

On January 31, 2006, Dr. Wright wrote a note, explaining that Plaintiff had a history of spells or loss of consciousness with an abnormal EEG (Tr. 1447). Dr. Wright explained that, because Plaintiff had episodes of loss of consciousness and loss of postural tone, he had not been able to work (Tr. 1447). Dr. Wright also mentioned that Plaintiff had significant daytime sleepiness due to sleep apnea "and he has been using CPAP." Because his episodes of loss of consciousness could not be predicted, he felt it medically safer for him not to drive (Tr. 1447).

On February 3, 2006, Dr. Brandon wrote a note in which he stated that Plaintiff was "currently unable to drive" due to a medical condition (Tr. 881). On February 7, 2006, Plaintiff

began seeing Michael R. Martin, M.D., for counseling (Tr. 1429-33). Plaintiff explained that he had difficulties with sleep (Tr. 1429). Although the notes are very difficult to read, it appears Plaintiff relayed his experience with the tornado and explained that he was afraid of storms (Tr. 1432). Plaintiff assessed his emotional pain as a seven/eight on a scale of one-to-ten where ten represented excruciating pain (Tr. 1430). On February 10, 2006, Dr. Martin wrote that Plaintiff was unable to work due to his mental health impairment (Tr. 1409). By May 2006, Plaintiff assessed his emotional pain at a level one/two (Tr. 1407).

On May 18, 2006, Dr. Breeding wrote a letter to clarify his December 2005 opinion (Tr. 942). Dr. Breeding stated that, although Plaintiff could occasionally lift twenty-five pounds, on "his best days he may be able to do basically sedentary activities" (Tr. 942). Plaintiff needed to lay down periodically to control his pain (Tr. 942). On "his worst days," Plaintiff would not be able to work at all (Tr. 942). Thus, Dr. Breeding opined that Plaintiff would not consistently be able to do even sedentary work (Tr. 942). On August 1, 2006, Dr. Martin wrote that Plaintiff's depressive disorder was severe and complicated by post-traumatic stress disorder, obsessive/compulsive disorder, and panic disorder (Tr. 1406). Dr. Martin explained that he was adjusting Plaintiff's medications to limit risk of seizures, elevated glucose levels, and chronic insomnia (Tr. 1406).

On March 28, 2006, Frank R. Pennington, M.D., reviewed Plaintiff's records for the state agency (Tr. 1448-55). Dr. Pennington set out a brief summary of Plaintiff's medical history and his rationale for his RFC opinion (Tr. 1455). Dr. Pennington explained that Plaintiff's alleged level of limitations was not supported by the evidence but that he had reduced Plaintiff's RFC

level due to obesity and back impairment (Tr. 1455). Dr. Pennington opined that Plaintiff remained capable of performing work at the light exertional level (Tr. 1449). Plaintiff needed to avoid all exposure to hazards, such as machinery and heights (Tr. 1452). He should never climb ladders, ropes, or scaffolds (Tr. 1450). He could perform all other postural activities on an occasional (as opposed to frequent) basis (Tr. 1450).

On March 28, 2006, Plaintiff saw G. Dean Wilson, Jr., M.D., of Tri-State Mountain Neurology Associates, P. C., at the request of Dr. Brandon (Tr. 1524-27). On examination, Plaintiff demonstrated full strength with normal muscle bulk and tone (Tr. 1526). His gait was slightly unsteady with turning (Tr. 1526). Dr. Wilson felt that Plaintiff's neuropathy was most compatible with his diabetes (Tr. 1526). Dr. Wilson prescribed medication and additional testing (Tr. 1527).

On April 6, 2006, Plaintiff was hospitalized for several days (Tr. 1458-64, 1528-32). He was evaluated by Vinaya Belagode, M.D. (Tr. 1462-64, 1528-29). On examination, Plaintiff had good hand grip, moved all his extremities, and his gait was normal (Tr. 1463). Plaintiff also saw Dr. Martin (Tr. 1458-61, 1530-32). Plaintiff reported suicidal ideation but no plan and no actual intent (Tr. 1458). He reported fear of storms with irritability, anger, and anxiety (Tr. 1458). On mental status examination, Plaintiff was friendly and cooperative with good eye contact and normal speech and behavior (Tr. 1459). His thought process was logical, linear, and goal directed (Tr. 1459). Dr. Martin assessed major depressive disorder and post-traumatic stress disorder, obsessive compulsive disorder and social phobia (Tr. 1459). He was admitted, given a course of medication, and released (Tr. 1460).

On May 30, 2006, Dr. Martin's office noted that Plaintiff's sugar level was normal (Tr. 1556). In June 2006, Plaintiff saw Dr. Martin who used a check-off system to report that Plaintiff was oriented, and had intact memory, cognitive function, abstraction, judgment, and insight (Tr. 1554). His emotional and physical pain level was assessed as mild (Tr. 1553). Dr. Martin checked the same boxes on August 1, 2006 (Tr. 1547). Dr. Martin also checked that Plaintiff's concentration was within normal limits (Tr. 1546). Plaintiff assessed his emotional pain at a level three/four on a scale of one to ten and his physical pain seven/eight on a scale of one to ten (Tr. 1546).

On August 28, 2006, Plaintiff returned to Dr. Wilson (Tr. 1520). Dr. Wilson explained that Plaintiff's EMG was within normal limits without evidence of denervation (Tr. 1520, 1523). Dr. Wilson noted that Plaintiff's nerve conduction study revealed mild left carpal tunnel syndrome (Tr. 1520).

On September 22, 2006, Plaintiff returned to Dr. Brandon with complaints of low back pain that left him unable to walk unless he used a walker (Tr. 1514-15). Plaintiff underwent a lumbar spine MRI scan on September 29, 2006 (Tr. 1516-17). The scan revealed moderate nerve root encroachment at the L-3/L-4 disc level due to generalized annular posterior disc bulging but, otherwise, minimal findings (Tr. 1516). On October 20, 2006, Plaintiff had changed from a walker to a cane and reported that he felt better with his pain medication (Tr. 1514).

On October 3, 2006, Plaintiff returned to Dr. Martin and reported sleep and appetite within normal limits but decreased concentration and energy and increased crying spells but no irritability (Tr. 1538). Plaintiff was oriented with intact memory, cognitive function, abstraction,

judgment, and insight (Tr. 1539). Plaintiff reported that his sleep was normal (Tr. 1538). Plaintiff assessed his emotional pain as three/four on a ten-point scale (Tr. 1538).

On October 23, 2006, Plaintiff saw Elizabeth A. Jones, M.A., at the request of the state agency (Tr. 1477-86). Ms. Jones noted that, although Plaintiff was passively cooperative, he did not appear to put forth much effort on his mental status tasks (Tr. 1477). She felt that Plaintiff's historical data "may have been exaggerated on occasion" (Tr. 1477). On mental status examination, Plaintiff had no difficulty with attention or concentration and responded to questions without repetition (Tr. 1480). Plaintiff reported that he cared for his eighteen-month-old son while his wife worked during the day (Tr. 1481). He prepared simple meals and used a riding lawnmower to cut the grass (Tr. 1481-82). Ms. Jones explained that the "T" scores indicated that Plaintiff significantly exaggerated his symptoms (Tr. 1482-83). As for post-traumatic stress disorder, Ms. Jones noted that the diagnosis was valid, but that Plaintiff was exaggerating his symptoms (Tr. 1485). Ms. Jones opined that Plaintiff should have no difficulty relating to others (Tr. 1482). Ms. Jones opined that Plaintiff had no difficulty in understanding and remembering short, simple instructions, in carrying out short, simple instructions and in the ability to make judgments on simple work-related decisions. He had slight difficulty in his ability to understand, remember, and carry out instructions (Tr. 1484). He had moderate restrictions in his ability to respond appropriately to others (Tr. 1485).

In November 2006, Plaintiff returned to Dr. Wilson for follow-up (Tr. 1519). Plaintiff reported that he still noticed "occasional" hand numbness and wore a wrist splint with some improvement (Tr. 1519). Plaintiff continued to complain of lower back pain (Tr. 1519). Plaintiff

reported several brief seizures during times when he had a fever (Tr. 1519). He continued to complain of foot paresthesias. Motor examination demonstrated 5+ strength with normal muscle bulk and tone. Sensory examination demonstrated a decrease to pinprick at mid tibial level with absence of vibration distally in the lower extremities. Romberg was borderline. There was no gross dysmetria. Gait was slightly unsteady on turning, but otherwise normal. (Tr. 1519). Dr. Wilson recommended continued conservative treatment for carpal tunnel (Tr. 1519).

On December 13, 2006, Plaintiff returned to Dr. Martin, who checked off the boxes that indicated Plaintiff was oriented with intact memory, cognitive function, abstraction, judgment, and insight (Tr. 1533). On December 15, 2006, Dr. Martin completed a form concerning Plaintiff's ability to perform work-related functions (Tr. 1567-69). Dr. Martin opined that Plaintiff had a poor ability to deal with the public; a fair ability to follow work rules, deal with stress (except for storms), and to concentrate; and a good ability to relate to co-workers and supervisors, and to use judgment at work (Tr. 1567). He had a good ability to understand, remember, and carry out even complex job instructions (Tr. 1568). He had a poor ability to behave in an emotionally stable manner and to demonstrate reliability, because he would not be able to work in stormy weather (Tr. 1568). He had a fair ability to relate predictably in social situations and a good ability to maintain his personal appearance (Tr. 1568).

Expert Testimony at the Hearing

Thomas Schacht, M.D., testified as a medical expert concerning Plaintiff's psychological condition (Tr. 1583-97). Dr. Schacht first summarized the medical record and noted several inconsistencies and examples of possible malingering (Tr. 1584-86). Dr. Schacht did not issue

an opinion of Plaintiff's ability to work. Edward Griffin, M.D., testified as a medical expert concerning Plaintiff's physical condition (Tr. 1597-1600). Dr. Griffin accepted Dr. Breeding's opinion that Plaintiff was limited to lifting twenty-four pounds occasionally, twelve pounds frequently, and six pounds constantly (Tr. 1598).[1] Dr. Griffin explained that these restrictions were reasonable based on Plaintiff's diabetic neuropathy (Tr. 1598). Dr. Griffin opined that Plaintiff could only stand for one hour at a time, up to about four hours in an eight-hour workday (Tr. 1598). He should not climb ladders or work with heights (Tr. 1598). He could occasionally climb stairs, bend, stoop, and squat (Tr. 1598). He would not be able to work on an uneven work site (Tr. 1599).

Donna Bardsley testified as a vocational expert (Tr. 1601-02). The ALJ posed a hypothetical question to the vocational expert, asking her to assume an individual of Plaintiff's age, education, and work history who was capable of performing sedentary work, although he could lift twenty-four pounds occasionally, twelve pounds frequently, and six pounds constantly (Tr. 1601). He should not climb ladders or work with heights (Tr. 1601). He could occasionally climb stairs, bend, stoop, and squat (Tr. 1601). He would not be able to work on an uneven work site (Tr. 1601). He was seriously limited but not precluded from work stress (Tr. 1601). The vocational expert identified jobs that such an individual could perform (Tr. 1601). She gave examples such as an information clerk (300,000 national jobs); cashier (500,000 national jobs); ticket seller (175,000 national jobs); hand packager (225,000 national jobs); sorter (185,000

---

[1] Although the hearing transcript reflects that the ALJ's reference to Exhibit 10F, page 10, which contained the lifting restrictions he was discussing, is a report from a "Dr. Green," an examination of Exhibit 10F shows it is actually a report from Dr. Breeding (see Tr. 949).

national jobs); and assemblers (250,000 national jobs) (Tr. 1601-02).

<u>Analysis</u>

The law is settled that the function of the courts in Social Security cases is only to determine whether the findings of the Commissioner are supported by substantial evidence, *Ingram v. Richardson*, 471 F.2nd 1268 (6th Cir., 1972). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, *Richardson v. Perales*, 408 US 389, 401 (1971). This Court must affirm the Commissioner's conclusion absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record, *Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir., 2004). Plaintiff argues substantial evidence does not support the Commissioner's decision. Plaintiff notes long time treating physician, Dr. Samuel D. Breeding, has opined that the Plaintiff must lie down periodically and would not consistently be able to do even sedentary work (Tr. 942). Plaintiff recognizes Dr. Breeding has also opined that the Plaintiff could sit for four to six hours in an eight hour day and could stand for two to four hours in an eight hour day, but should be allowed to sit or stand as needed for comfort (Tr. 1405). Plaintiff's neurologist, Dr. Douglas A. Wright, had opined that the Plaintiff has not been able to work as a result of his loss of consciousness and lost of postural tone and also opined that the Plaintiff had significant daytime sleepiness from his sleep apnea (Tr. 1447). Plaintiff's treating psychiatrist, Dr. Michael R. Martin, opined the Plaintiff was unable to work as a result of his mental conditions (Tr. 1436) and reported in August 2006, that the Plaintiff's depressive disorder remained severe and that his condition was complicated by PTSD (Tr. 1406). In spite of these

opinions from the Plaintiff's treating physicians, the ALJ concluded Plaintiff was not disabled, that Dr. Breeding's assessment of the Plaintiff's ability to perform work related activities was not supported by his examination or the rest of the objective medical evidence (Tr. 21), that Dr. Wright's opinion was not supported by his own office records, his objective physical and mental status exams or the rest of the objective medical evidence of record and therefore was of no probative value (Tr. 22).  Finally, the ALJ found Dr. Martin's mental status examinations did not support his opinion and that neither Dr. Martin's records, nor the rest of the objective medical evidence of record reveal a seizure disorder not well controlled (Tr. 24). Plaintiff argues the ALJ has pointed to no medical evidence which contradicted any of these opinions with the exception of a consultative exam regarding the Plaintiff's mental status (Tr. 244) and that the ALJ is not a physician, and  is not free to set his expertise against that of a physician, citing *Nelms v. Gardner*, 383 F. 2d 973 (6th Cir., 1967).

The Commissioner in response argues the ALJ reasonably found Plaintiff capable of performing a range of sedentary work and able to perform work that exists in significant numbers in the national economy, despite his impairments.

The treating physician rule which gives greater and sometimes controlling weight to the treating physician is based on the assumption that a medical professional who has dealt with a claimant over a long period of time has a deeper insight into the claimant's condition than one who has examined a claimant but once or simply reviewed the medical evidence. *See Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994). However, the ALJ is not required to accept any medical opinion, even that of a treating physician, if that opinion is not supported

by sufficient clinical findings. See 20 C.F.R. § 404.1527(d)(3); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("This court has consistently stated that the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

For reasons that follow, I conclude there is substantial evidence to support the ALJ's decision.

Drs. Breeding and Wright

Plaintiff argues that the ALJ erred in not accepting the opinion of Dr. Breeding, who opined that Plaintiff needed to lie down periodically and could not even perform sedentary work on a consistent basis. Plaintiff's Brief at 10, citing to Tr. 942, 1405. Plaintiff further argues that the ALJ erred in rejecting the opinion of Dr. Wright that Plaintiff would be unable to work due to his loss of consciousness and postural tone, as well as his significant daytime sleepiness from his sleep apnea. Plaintiff's Brief at 11, citing to Tr. 1447. Plaintiff cites to the treating physician doctrine and argues that these opinions were consistent with the record evidence and not contradicted by Dr. Griffin's testimony. Plaintiff's Brief at 13. Plaintiff argues that the ALJ erred in not accepting the limitation for a sit/stand option and the effect of his seizure disorder. Plaintiff's Brief at 15.

However, as the Commissioner notes, Dr. Breeding issued several opinions concerning Plaintiff's ability to work. In February 2004, Dr. Breeding suggested that Plaintiff's condition had improved and it was time to consider the possibility of Plaintiff returning to light duty (Tr. 964). In July 2004, Dr. Breeding released Plaintiff to return to work with a restriction from

lifting over twenty pounds, to avoid repetitive bending, and, on occasion, that he may need to sit (Tr. 957). In December 2005, Dr. Breeding opined that Plaintiff could lift twenty-five pounds occasionally; sit for four-to-six hours in an eight-hour workday; stand for two-to-four hours in an eight-hour workday; and needed a sit/stand option for comfort (Tr. 1405). The ALJ found an RFC that accommodated all these specific restrictions set out by Dr. Breeding, except for the sit/stand option (Tr. 25, 1598-00, 1601). For example, the ALJ found that Plaintiff retained the ability to work at the sedentary exertional level, which accommodated the lifting restrictions (Tr. 25, 1598-99, 1601). Sedentary work also accommodates Plaintiff's standing and sitting requirements, except for the alternation of positions (Tr. 25, 1598-99, 1601). The ALJ also found that Plaintiff could bend occasionally (as opposed to frequently) (Tr. 25, 1599, 1601).

The ALJ also found that Plaintiff could stand for an hour at a time, for four hours in an eight-hour day (Tr. 24, 1598, 1601). Considering that sedentary work is performed while sitting, it appears reasonable to the undersigned that an accommodation for standing no more than an hour at a time would accommodate Dr. Breeding's concern about Plaintiff's ability to stand. At the administrative hearing, Plaintiff did not complain of an inability to sit for a long time, but only complained of his inability to stand and walk (Tr. 1583). For example, in August 2003, Plaintiff reported pain with walking or prolonged standing (Tr. 894). In March 2004, Plaintiff reported that he was weak when standing or walking "very long" (Tr. 961). In April 2005, Plaintiff went to the hospital with a complaint that he was unable to walk (Tr. 1354, 1456-57). In September 2006, Plaintiff complained of low back pain that left him unable to walk unless he used a walker (Tr. 1514-15). Thus, as the Commissioner notes, the record reflects Plaintiff

complained of an inability to walk for prolonged periods but did not complain of an inability to sit.  Plaintiff, in his Brief, does not point to any complaints of an inability to sit for the prolonged time contemplated by the definition of sedentary work. There is little or no objective evidence to support an assertion that he would not be able to perform sedentary work or needed a sit/stand option.

Dr. Breeding's May 2006 opinion, which clarified that what he really meant by his December 2006 opinion, if accepted, would indicate that Plaintiff would not be able to perform even sedentary work on a consistent basis (Tr. 942).  The ALJ rejected this later evaluation because of an essentially normal physical examination in December 2006. Based on all of the evidence, the ALJ was reasonable in this conclusion.  *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) (ALJ did not err in rejecting treating physician opinion because the doctor "did not provide any objective medical evidence to support his change of heart").   There is other evidence in the record to support this conclusion.  In December 2006, Plaintiff had a normal gait and station (Tr. 1404).  He used no assistive device (Tr. 1404).  He had normal range of motion of all major joints except for the lumbar spine (Tr. 1404).  Dr. Breeding, who was aware that he was issuing work-related restrictions, did not mention that Plaintiff would not be able to work five days a week.

In January 2006, Dr. Wright restricted Plaintiff from driving, an action which the Commissioner argues is a typical cautionary measure for reported seizures (Tr. 1447).  Then, rather than issue work-related restrictions, Dr. Wright merely stated that Plaintiff had not been able to work (Tr. 1447).  The Commissioner argues it is somewhat unclear whether Dr. Wright

meant that he was opining that Plaintiff could not work or was simply repeating what Plaintiff

had told him. In any event, it is the restrictions the ALJ finds reasonable that are essential to the

ALJ's analysis and not solely a declaration that Plaintiff could not work. The ultimate

determination of whether a claimant is "disabled" within the meaning of the Act rests with the

Commissioner, not with the treating physician. *See* 20 C.F.R. § 404.1527(e)(1); *see also* Social

Security Ruling (SSR) 96-5p, 61 Fed. Reg. 34471, 34474 (July 2, 1996) (a treating physician's

conclusory opinion that an individual is "disabled" is never entitled to controlling weight or

special significance).

There are other reasons to support the conclusion reached by the ALJ. Dr. Wright's

opinion of disability is contradicted by his own treatment records and Dr. Wright expressed

concern about Plaintiff's credibility. In March 2005, Dr. Wright explained that, when asked to

lift his right leg, Plaintiff, "with apparent theatrical impressive effort," was unable to lift his right

leg (Tr. 1363). When asked to lift his left leg, he gave "good downward pressure" on his right

leg, which suggested that he was able to move his right leg (Tr. 1363). Although Plaintiff went

to the hospital and reported that he was unable to walk, an MRI of the lumbar spine revealed no

significant abnormalities (Tr. 1354, 1456-57, 1473). In May 2006, Dr. Wright observed Plaintiff

walking "completely normal[ly]" in the hallway (Tr. 1505). Plaintiff reported better sleep with

the CPAP and Dr. Wright felt that Plaintiff's excessive daytime sleepiness would improve with

the CPAP (Tr. 1507). Thus, Dr. Wright's own treatment notes contradict his conclusory

statement of disability.

In addition, there were other medical opinions in the record that contradicted those parts

of the opinions of Drs. Breeding and Wright that opined Plaintiff was disabled. Dr. Jewell, who examined Plaintiff in September 2004, opined Plaintiff was ready to return to work, with reasonable restrictions to avoid re-injury (Tr. 1339). In January 2006, Dr. Lester opined that Plaintiff remained capable of performing medium work (Tr. 1441). In March 2006, Dr. Pennington opined that Plaintiff remained capable of performing light work (Tr. 1449). Then, in February 2007, Dr. Griffin opined that Plaintiff could perform work consistent with sedentary work but with lifting abilities greater than sedentary work (Tr. 1598). The record contained numerous opinions that contradicted these disabling opinions of Drs. Breeding and Wright.

The objective test results, while supporting some restrictions, do not support Plaintiff's allegations of total disability. For example, in March 2005, when Plaintiff went to the hospital for treatment of a seizure, his tests were normal (Tr. 1350-59, 1513). In April 2005, when Plaintiff went to the hospital to complain that he was unable to walk, his lumbar spine MRI scan revealed no significant abnormalities (Tr. 1354, 1456-57, 1473). In August 2006, Plaintiff's EMG was within normal limits without evidence of denervation (Tr. 1520, 1523). In September 2006, when Plaintiff returned to Dr. Brandon and complained that he was unable to walk unless he used a walker, his lumbar spine MRI scan revealed moderate nerve root encroachment but, otherwise, revealed minimal findings (Tr. 1514-17).

Finally, Plaintiff was treated conservatively with medication, epidural injections, compressive stockings, a CPAP machine, physical therapy, weight loss, and, in the case of his carpal tunnel syndrome, with a wrist splint (Tr. 894, 916, 989-92, 1350, 1507, 1517). In light of those factors, I conclude the ALJ reasonably rejected the disabling opinions of Drs. Breeding and

Wright as not consistent with the record evidence.

### Dr. Martin

Plaintiff argues that the ALJ erred in not accepting the opinion of Dr. Martin, who opined that Plaintiff was unable to work. Plaintiff's Brief at 16, referring to Tr. 1409. As support, Plaintiff relies on the opinions issued by Ms. Jones and Dr. Lawhon. Plaintiff's Brief at 16, referring to Tr. 1382, 1845. The ALJ explained his rationale for the weight given these mental health professionals in considerable detail (Tr. 26).

Plaintiff saw Dr. Lawhon in December 2005, more than two years after his alleged onset date (Tr. 1379-82). Dr. Lawhon diagnosed depression and post-traumatic stress disorder (Tr. 1381). However, even with these diagnoses, Dr. Lawhon opined that Plaintiff's "B" criteria were either not significantly limited or only moderately limited (Tr. 1382). In December 2005, Dr. Lawrence opined that Plaintiff could perform simple repetitive tasks and relate adequately to others (Tr. 1385). It was not until February 7, 2006 that Plaintiff began seeing Dr. Martin (Tr. 1429). Shortly thereafter, on February 10, 2006, Dr. Martin opined that Plaintiff was unable to work due to his mental health impairment (Tr. 1409).

The ALJ explained that Dr. Martin's later treatment notes did not support this opinion (Tr. 23). For example, Plaintiff was asked to assess his emotional pain on a scale of one-to-ten, with ten representing excruciating pain (Tr. 1430). Although Plaintiff assessed his emotional pain as a seven/eight in February 2006, he assessed it at a level one/two in May 2006 (Tr. 1407, 1430). In August 2006, and again in October 2006, Plaintiff reported that his emotional level was three/four (Tr. 1538, 1546). Dr. Martin repeatedly reported that Plaintiff had intact memory,

27

normal cognitive function, abstraction, judgment, insight, and concentration (Tr. 1533, 1539,

1546-47, 1554). Notwithstanding these normal findings, Dr. Martin opined in December 2006

that Plaintiff had a poor ability to deal with the public, behave in an emotionally stable manner,

and to demonstrate reliability (Tr. 1567). The ALJ reasonably discounted this opinion as not

consistent with the record evidence.

Ms. Jones opined that Plaintiff had no difficulty relating to others and either no or slight

difficulty in his ability to understand, remember, and carry out instructions (Tr. 1484). She

opined that Plaintiff had moderate restrictions in his ability to respond appropriately to others

(Tr. 1485). Plaintiff argues that the ALJ did not adequately address these restrictions and that he

needed further mental RFC restrictions. Plaintiff's Brief at 16. However, the record reflects that

the only real stressor for Plaintiff is his fear of storms (Tr. 1581). Moreover, Ms. Jones, herself,

questioned Plaintiff's credibility, explaining that the "T" scores indicated that Plaintiff

significantly exaggerated his symptoms (Tr. 1482). Thus, the ALJ reasonably found that Plaintiff

was seriously limited but not precluded from working due to stress (Tr. 25, 1601).

<u>The ALJ's step five finding was supported by substantial evidence</u>

Plaintiff argues that the ALJ did not meet his step five burden. Plaintiff's Brief at 17-18.

He argues that the ALJ found that his ability to perform sedentary work was significantly eroded

and, thus, under SSR 96-9p, a finding of disability is "usually" appropriate in such a case.

Plaintiff's Brief at 17. However, the ALJ found that Plaintiff could perform slightly more than

sedentary work, in that the weights Plaintiff could lift were closer to light work than sedentary

(Tr. 1601). As the Commissioner notes, Plaintiff's restrictions did not fit exactly into a full range

of either light work or sedentary, which is exactly the reason that a vocational expert is called. Here, the vocational expert testified that 1,450,000 national jobs existed that Plaintiff could perform (Tr. 1601-02). This is a significant number of jobs. As an initial matter, the standard is based on jobs available in the national economy, and not in the local economy. *See* 20 C.F.R. § 404.1566 (national market controls). This constitutes a significant number of jobs available in the national market. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) ("The decision [of the number of jobs to be considered significant] should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.")

Plaintiff argues that, although the vocational expert testified that the jobs were consistent with the Dictionary of Occupational Titles, this is not accurate. Plaintiff's Brief at 17. He argues that nearly all cashier jobs in the DOT were light work and the job of hand packager is a medium job. Plaintiff's Brief at 17-18. Again, this is the reason to have a vocational expert testify. The vocational expert gave examples of jobs that Plaintiff remained capable of performing and was responding to an accurate hypothetical question posed by the ALJ (Tr. 1601-02). Although some courts take a contrary view, the Sixth Circuit gives substantial weight to the opinion of the vocational expert. In *Conn v. Secretary of Health and Human Services* 51 F.3d 607, 610 (C.A.6 (Ky.),1995) the court addressed this same issue:

> Claimant's last alleged error concerns the testimony of the vocational expert concerning the classifications of the jobs described as "sedentary" by the vocational expert. While the vocational expert describes certain jobs as "sedentary," the *Dictionary* classifies jobs with the same name as "light" or "medium." Claimant contends that the expert must rely on the *Dictionary* classification or explain the source of the rating. Because the vocational expert's rating was different from the *Dictionary*, claimant alleges error. Claimant asks for a remand to resolve the discrepancy and states that the Sixth Circuit has not

addressed this issue directly.

While it may be true that at the time of filing Appellant's brief the Sixth Circuit did not have a published opinion directly on the issue, at least one published decision has since addressed the issue raised by claimant. In *Barker v. Shalala,* 40 F.3d 789 (6th Cir.1994) (Martin, Nelson, Daughtrey) (per curiam) the Court held that while the ALJ may take judicial notice of the classification in the *Dictionary,* the ALJ may accept testimony of a vocational expert that is different from information in the *Dictionary of Occupational Titles.* In an unpublished opinion, *Basinger v. Secretary of Health and Human Servs.,* 33 F.3d 54 (6th Cir.1994) (Boggs, Guy, Contie), the Court stated that the ALJ may rely on the testimony of the vocational expert even if it is inconsistent with the job descriptions set forth in the *Dictionary.*

Even without the holdings of these two recent opinions, the ALJ was within his rights to rely solely on the vocational expert's testimony. The social security regulations do not require the Secretary or the expert to rely on classifications in the *Dictionary of Occupational Titles.* 20 C.F.R. § 404.1566(d).

I conclude the ALJ met his burden at step five by relying on the testimony of a VE in response to a hypothetical question that accurately portrayed Plaintiff's credible physical and mental limitations. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777 (6th Cir. 1987) (ALJ may rely on testimony of a vocational expert in response to an accurate hypothetical).

In this case, the ALJ was faced with several conflicting medical opinions and considerable evidence suggesting exaggeration of symptoms. The ALJ is given considerable latitude in situations such as this. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts."). The ALJ was simply doing what he was charged to do: weigh the medical and record evidence and make a determination as to disability. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("This court does not try the case *de*

*novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.").

Conclusion

For the reasons stated herein, I conclude there is substantial evidence to support the conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND Defendant's Motion for Summary Judgment (Doc.13) be GRANTED, the Plaintiff's Motion Judgment on the Pleadings (Doc. 11) be DENIED, and this case be DISMISSED.[2]

Dated: August 11, 2008          *s/William B. Mitchell Carter*
                                UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).